Because this is a little unusual, I do want to make sure that everybody understands in advance what the time is. Mr. Inzunza is the appellant here, and he will have 15 minutes total time. The government, which is the appellee in the Inzunza case, will have 30 minutes, which also includes 15 minutes of time as appellant in the Zuckett matter. Is that correct? And then we will have 15 minutes of response from Mr. Zuckett's attorney. Does everybody understand the ground rules? Yes, Your Honor. All right. Thank you, Your Honor. My name is Ben Coleman. I represent Mr. Inzunza. The pronunciation was good on that one. I believe it's Mr. Zuckett. Zuckett. Okay, good. I know I've raised a lot of issues, and it's a very long brief. What I'd like to do, unless the court has a different preference, and I'm happy to answer questions on anything, what I'd like to do is first discuss some of the areas of misconduct that we have alleged. And in particular, I'm going to focus on the misconduct related to the cooperating witness, Michael Ghilardi. I would like to address all the issues of misconduct, but I don't think I'm going to be able to get to all of them. If I have time, I would then also like to address the failure to give a good theory of defense instruction, if I have time to get there. Before you get there, I'm going to be asking the government as well on this. The intangible right to honest service is a right of honest service. With the history of McNally, the way that statute was amended. We have an anomalous situation here in California that at least post-McNally, we don't seem to have any clear definition of what that means. Are you aware of any definition in the United States Code or in any of our cases that defines the term honest services, post-McNally? There is no definition in the Code whatsoever. The statute 1346 just throws out the words honest services. There's no definition. In the case law, there is no specific definition in the Ninth Circuit. There are cases where in other circuits, and maybe a couple in this circuit, where the court will say, well, this does constitute honest services. Or there are other cases where they assess the particular facts of the case, and the court says, this doesn't constitute honest services. But there's no coherent definition, which is why several members of the Second Circuit found that the statute was unconstitutionally vague on its face, and other courts have made that suggestion. There are cases which, for instance, the Seventh Circuit says, well, you at least have to show private gain. The Third Circuit says, well, you at least have to show a state law violation. But there is no statutory definition. There is no explicit definition of in any cases that this is what it is. McNally has some language, but of course this statute was enacted after McNally. So there is none. It's our position that it's a vague statute. If that's correct, if the statute is vague, and this is in fact a criminal statute, then the rule of lenity applies, does it not? Absolutely. And in this case, what would that mean from your perspective? Well, we've addressed that on a few different points. Number one is, it's our position that under the rule of lenity, the private gain requirement is a requirement of honest services. Number two, under the rule of lenity, the state law violation requirement is a requirement of honest services. So at least in those two respects, we think that those are elements of the offense that should be seen as part of the statute under the rule of lenity. And are you aware of any, in this case, California state law that would be the state law that would be the predicate for at least the Texas case? And Brunei, I think it is, that said there was a requirement for a state law violation in order to have a failure of honest services in this setting. Well, I want to make clear that the campaign contributions that were all reported did not violate any state or local statute. I understand what you're saying it didn't do. If you were the prosecution, what law would you be referring to that would allegedly have been violated? So it's state law. If I were them, what I would have done, I assume, and their theory of guilt, their theory is very unclear, I guess I would have alleged a state law bribery statute, which they did not do. And from your perspective, were they to have alleged that, would that have had to have been included in the indictment? Yes. It would have. Yes. On the issue of the misconduct, and again, I'm going to just try to focus in, we think that there's several, like the Say It Ain't So and some of the other vouching, the United States winning when justice is done, all these types of arguments. I'm going to focus in on Ghilardi misconduct, and the first one I want to focus in on is the Brady violation. Ghilardi's testimony was critically important in this case, and in two specific respects, at least. Number one is that Ghilardi specifically testified that the intent of these contributions was to bribe, that these were all intended to be bribes. And number two, he provided the, what I call blockbuster testimony, that there were actual underhanded cash payments in this case. Those cash payments were not corroborated at all by any of the recorders. Ghilardi himself said that we gave them, on two different occasions, underhanded cash. One, and these were back-to-back in the spring of 2003, that Mr. Azusa received $2,000 in cash, and then a few weeks later he received a portion, presumably a third, of a $10,000 cash payment. So this dramatically takes the case from reported campaign contribution checks that are all disclosed to campaign authorities to your more typical underhanded cash bribery case. The testimony was critically important. In this case, counsel, if you take for a moment the concept that the state bribery statute underlies the honest services argument here, a campaign contribution itself, whether or not reported, can be the basis for a quid pro quo and guilt, right? Yes. Even though it's not an underhanded cash payment. Yes, absolutely. But the reason why it was important is because if you take aside the cash payments, and let's put those aside, what the government's case against Mr. Azusa is that on three occasions, his colleague, Mr. Zuchett, received campaign contributions. So their theory of bribery is that Mr. Azusa engaged in a bribe where he didn't receive a dime. The only thing that he was involved in was Mr. Zuchett receiving campaign contributions. That's a weak theory of bribery. It's a very unusual theory of bribery. It is razor thin. So what Ghilardi did is he provided the motive. He provided the punch. He provided the fact that Mr. Azusa himself actually received cash that he stuck in his own pocket. And it was a dramatic turning point in the trial. Now, after the trial, the government produces a document in which Ghilardi says that directly contributing his testimony that these were all bribes, he says that he gave the counsel. This is the O'Melveny document. O'Melveny and Myers memorandum. He tells his lawyers at O'Melveny that I gave them pure, he uses the word pure, campaign contributions and I was not doing anything wrong. When he says that, at the same time, he admits that he bribed all these other officials in Las Vegas. But he says with respect to the San Diego councilman, those were pure campaign contributions. I wasn't doing anything wrong. It is the exact opposite of his testimony at trial. The government concedes that they had it in its possession. They concede that it's exculpatory. And their only argument is that it's not material. This case, this court over and over again, in cases, the in-bank case in Carragher v. Stewart and Ben v. Lambert, the 28th case just last week, the Sylvia case. And we probably cited a half a dozen other ones. This court has consistently said that when impeachment material on a cooperating witness is not disclosed, that that is material. And this is, this goes to the heart of the case. And over and over again, this court has said that even if there were other ways to impeach the witness, it's not good enough. Because when we're dealing with cooperating witnesses, where there's this real danger that the truth-seeking process can be distorted because the government has this opportunity to offer something that's more precious than even money, freedom, to the witness, that we're going to take a look very closely and we want to make sure that the defense has every single bit of impeachment material that there is. If we agree with you, you're talking about the discovery of inculpatory as opposed to exculpatory material, right? No, exculpatory. Okay, why would that be the case? And the government does not argue that it wasn't exculpatory. His statement to his lawyers was that the money that I gave to the San Diego councilman was pure campaign contributions. And I wasn't doing anything wrong. Let's assume you're right. What authority do you have for the concept that there is a continuing obligation to disclose, not just a one-time obligation to disclose whatever the government then knows? Well, I believe the case law is clear that if it's in their possession, it has to be turned over. I mean, even what usually happens in a Brady context is because there's a continuing duty to disclose, what happens is after the trial, the government turns something over. That's generally how Brady occurs. So they always have an obligation to turn over exculpatory material as soon as they discover it. They had it in their possession. Would the government have known prior to the trial that the O'Melveny document was exculpatory? They had it in their possession. I know they had it in their possession. That's not what I asked. I asked if the government would have known in advance. The government doesn't have an obligation to turn over everything it's got. It has an obligation to turn over anything that's arguably exculpatory. Right. Should the government have anticipated prior to trial that the O'Melveny document was exculpatory? I understand why once Gillardy gets on the stand, I understand the government's position to be that they were as surprised as everybody else by Gillardy's testimony. Oh, no. They weren't surprised by Gillardy's testimony. They had been prepping Gillardy for months before the trial. They were prepping him to say that these were bribes. There was no surprise to the government. I thought the $10,000 figure was a surprise to the government. It was a surprise to the defense. It was a surprise to the court, but it wasn't a surprise to the government. The government knew about this months before the trial, and that's why Judge Miller was so infuriated with the government, because they knew months before trial they represented to the defense and to the court in response to a bill of particulars motion that there will be no surprises. Everything has been turned over and discovered. These are their in-court representations, and they lied. They misled the defense. They misled the court. They knew that Gillardy was going to testify about the $10,000, and they hid it. They didn't even mention it in opening statements because they wanted to hide it, and that's when it infuriated Judge Miller so much. So they knew Gillardy was going to testify in this manner. They knew they were prepping him to testify that there were going to be bribes, and they withheld the pure campaign contribution, I wasn't doing anything wrong statement. And that in and of itself, we can put aside all the other misconduct, but that in and of itself should require a reversal. So where did you get the O'Melveny documents? We got it several months after the sentencing. I think we got it, like, I want to say the sentencing was in November of 2005, and it was finally turned over in February of 2006. And those dates may be slightly off, but I think that's about the accurate. But it gets even worse, though, because what the government does in closing arguments to add insult to injury is that in closing arguments, they argue, they make the improper argument that the defense has been provided with any inconsistencies that Gillardy had, which is basically suggesting that we know he's telling the truth, we've interviewed him, anything that was inconsistent has been turned over. That argument in and of itself is improper, but what's worse is that it was false, because the government had not turned over all the exculpatory evidence. So this is, as you see as I go through this, we start with one after another after another piece of misconduct, and it just builds and it builds and it builds. And it's our position that each one in and of themselves should require reversal, but when you keep on looking at the building misconduct, cumulatively it should certainly require reversal. Was Gillardy's testimony that he gave cash inconsistent with that cash being a campaign contribution? His testimony was inconsistent because in addition to saying that he gave him cash, he testified that the intent was to bribe. The intent was not to give a legal campaign contribution. The intent was to bribe. And in the statement, the O'Melveny statement, he said, no, the intent was pure campaign contributions and I wasn't doing anything wrong. Now, there are other instances where the government engaged in this conduct with respect to Gillardy. In a Rule 28J letter that was submitted several months ago, I think about six months ago, we cited the Brown case from this court, which says that you're not allowed to introduce a polygraph provision of a plea agreement. In this particular case, the government introduced, and Brown says if prosecutors do that, they should expect reversal. In this case, the government introduced the polygraph provision of Gillardy's plea agreement. This court has said that it's highly impermissible vouching. If it's done, you should expect reversal. And, of course, it was done in this case, and we believe that the government should therefore expect reversal. So, again, we start to pile up the different misconducts, one after the other after the other, and it gets to the point where this just simply was not a fair trial. And I believe that, you know, that was one of the things that Judge Miller was infuriated about. This simply was not a fair trial as to Ms. Franzunza. And I see I have about a minute-seventeen remaining, and unless there are other questions, I'll save it for rebuttal. Good morning. May it please the Court? I'm Demetra Lambros. I'd like to save five minutes for rebuttal, please. I'd like to start, I think, to talk a little bit about the question about the Honest Services Statute. What happened is, before McNally, the states and the federal government, they were defining what it meant by honest services under the Wire Fraud Statute to include the intangible right of honest services. And they were finding that state officials under the federal Wire Fraud Statute had a duty to provide honest services to their constituency. But how is that defined, though? Well, at the time, and what has happened is this may have come up through the case law, and what has happened is there are two basic strains through the case law that we've seen honest services statutes, honest services violations come under. One is bribery, and the other one typically is a failure to disclose a conflict of interest. Those are typically the two strains of honest services. Okay, well, let me just try to understand this. Let's talk about what happens in Congress, in the U.S. Congress. Whether it's a good thing or a bad thing is another matter. Virtually every member of Congress is involved in drafting or, if their staffs draft legislation, and they're trying to influence it one way or another. And they are regularly accepting campaign contributions. And their staffs and the people who help raise money for them are perfectly aware that many of the people who are making campaign contributions would like them to amend a particular provision of a law or to insert something or to sponsor or co-sponsor a law. In this case, you've got someone who agreed to go away from the no-touch to return to the previous standard. Another person who seemed to be generally okay but not so sure. The campaign contributions, other than Gilardi, seemingly all of them open and disclosed. Since this is a criminal statute that post-McNally has not been very well defined, you can see what a close issue this is. We don't send people to jail for long periods of time for violations of federal law when it is not clear what the criminal conduct is. So, given the congressional, what happens there, my first question to you is, does the government contend that there has to be a state law violation in order for there to be a violation or deprivation of the right of honest services? No, we do not. You do not. Okay. So, if there's no state law violation, then how is it defined? Well, again, it is defined under the two different strains of bribery and the failure to disclose. This one, we believe, when we, with what happened here, this was alleged as a quid pro quo. The indictment very clearly said that the, that Enzoza and Zucchett took campaign contributions in exchange for them to be correctly influenced in terms of helping repeal no-touch. Now, that is a quid pro quo. That is illegal. And cases have said, there are other cases in that that is like a form of bribery. But Cormac itself said it is illegal to accept campaign contributions in exchange for a promise to do a specific act. This kind of case, any politician would be aware that an express, an explicit exchange of help for receiving it. The government's belief that our law is so clear that any congressman would understand what you just said. I think our law is clear, especially with the Supreme Court having said in McCormick that it is illegal to make a promise in exchange for a campaign contribution. It's illegal. And, in fact, this court has said in its jury instructions quite clearly that if a public official accepts money in exchange for a specific requested exercise of official power, such acceptance violates the law regardless of whether the payment is made in the form of a campaign contribution. That's this court's jury instruction 8.118. So, yes, to trade money for a vote is illegal. And any politician should know that. But back to the question of the state law violation. What's happened with McNally? McNally said, you courts, you have been finding all these honest services fraud violations. We don't see that in 1341. We don't see that that statute meant to do it. So, what they said is, Congress, if you want to really provide an honest services violation, you better be pretty clear and you better tell us what you're doing. So, Congress did that. It then passed 1346, and the intent of legislative history is replete. And this court in Fraga recognized that what Congress meant to do in that case was to revive that whole pre-McNally line of cases. How can we say that? The reality is, as I understand it, there were no committee hearings at all, right? There were no committee hearings. There were no committee hearings. The only statements on the floor appear to have been from Congressman Conyers, who simply said this was designed to overturn McNally. Well, and there were a few others in the Senate as well. Senator Biden also made a statement that said, the whole point of this, we don't like McNally. We want the intangible rights doctrine back. We want honest services as it has been developed in the case law. And he said, and we're trying to revive this. And this court, twice, I think in both the Fraga and the Williams case, have recognized that that is exactly what 1346 did. And so, we're not talking about having to find some sort of free-flowing federal fiduciary duty here. What we're talking about is when Congress did pass 1346, they meant to resurrect that pre-McNally line of cases, which did not require a state law. And you based that on what was said on the floor of the House and the Senate. Well, it's not just I who based it. This court has based it on that as well. And it was based on the fact that it was a reaction to McNally, that Congress clearly didn't like the ruling of McNally. It happened very quickly after McNally. But they were going through that process. And also, the whole question of a state law violation also is important. Typically, in the cases, that has arisen in the context of a duty to disclose and whether there has to be a state law duty disclosed. But as the district court found in this case, such a state law violation would be especially inappropriate here, where the charge and the proof was this exchange of money for a vote. So it's said that we look at state law for a limiting principle. This case provides a particularly inappropriate basis for that because we're not talking about that duty to disclose line. Why is a bribery inappropriate for somebody who promises a legislative act in return for money? Why is that inappropriate? Yeah. Because it's what the Supreme Court says is inappropriate. You can't trade your vote for money. No, but I thought you said it is inappropriate to use bribery. Well, because in that situation, the whole idea about finding a limiting principle is to give fair notice so that people would actually know what it is that should and should not be against the law. There's no question that there's notice that bribery, this for that, would be against the law. So there would not be a requirement to have a state law violation prove the bribery when we have federal law. 1346 can be seen and is seen as a federal statutory basis for imposing an honest services violation. You said a minute ago when there's an explicit agreement. But as I understand it, your position is that it doesn't have to be explicit. No, it depends on what explicit means. And as this court has said, explicit, the explicitness requirement in the formant is not about the particular words that are used. It's about the clarity of the understanding. It is. I know the statement, it said it doesn't have to be verbally explicit. And I looked at that and I thought, now, how can you be explicit other than verbally? Well, like both this court said in Tucker and as the Supreme Court said in Evans, a lot of times these things happen with winks and nods. People don't say the words, okay, I'm bribing you now. Fine, let's go. But it can be an understanding. Now, the understanding has to be clear. It has to be a this for that. That's what the explicitness requirement does serve. But it is a this for that. And here it was, money for help in repealing that. I think it kind of gets back to the opening questions of Judge Smith. The wink and the nod, it seems to me, accompanies virtually every campaign contribution of great size. Well, Judge, that may be a cynical way of looking at the world, actually. Because it may be that what the law is saying is that a quid pro quo is when the politician is saying that I'm going to be controlled by my promise. Other considerations aside, I'm going to be controlled by that promise. That's a lot different than saying I'm going to be controlled by my views. I understand the distinction there. And what's the best evidence we have here of that kind of a promise? Well, we'll go to Inzunza, the question of the sufficiency. As the district court found, there was clearly for Inzunza a promise at the beginning to repeal No Touch in exchange for those campaign contributions. He knew from the first meeting with Malone and D'Antino in the spring that Ghilardi wanted to repeal No Touch. And, in fact, he made his promise early in the spring to exchange money for $8,650. He promised at that point, as the district court found, to exchange, that he would help with repeal of No Touch in exchange for that money. And the money, but was that the money that went to the other candidate or part of it went to him and part of it went to the candidate? No, this was money in the spring. The first installment of money that the district court found was part of the honest services fraud, $8,650. And Inzunza was very excited to get this money. It found that, at that point, Inzunza made a promise to help repeal No Touch. That was the June 2001 contribution.  Wasn't that for Zucat's campaign? No, that was the $8,650 in the June 2001 payment. That was for Inzunza himself. There was some graphic testimony that, when he got it, he said, you know, I was very, in so many words, I was very excited about receiving this money. Do you mind sending us a 28-J letter on these points? Number one, I'd like the citation for what Senator Biden said and also Congressman Conyer. In other words, whatever the government has to back this up and also the specific portions of our cases that you say that. Williams, for example, was not a public corruption case. It had to do with whether the public corruption pre-McNally cases were to go, you know, into the private area. So I'm very interested in this particular focus, if you could address that. Okay, and it is, I will, and it's the Friega case, which was the corrupted judge's case, too, in which this court found that 1346. That would be very helpful. And to the degree that counsel for the defendant would like to weigh in on the same issue, I would be grateful, and I know the other members of the court would as well, on a 28-J basis. We don't want to make long things, just something focused on this. Right, okay. And if I may, because I am running out of time here a bit on the Inzunza address to these claims of misconduct. On the O'Melveny memo, if I may first be sure that the court understands exactly what this was. The O'Melveny memo was a memo that was produced by, that was created by Inzunza's lawyers. It was handed over to the Inspector General in Los Angeles, DOJ, by one of Ghilardi's employees. The IG was in an investigation entirely separate from our investigation. They were investigating corruption by some Las Vegas federal agents. The IG sees it. He sends it to the public integrity section in Washington, who then sees it and says, oh, this is privileged matter here, and puts it under seal. This doesn't have anything to do with our case. I just want you to understand the question, you know, the circle around the government would be very, very big here. This wasn't one of our cops. This was one of our investigators, not one of our lawyers who had it. But anyway, as the district court found, that evidence fell far short of being material. In the first place, it was cumulative. Ghilardi had a number of statements before when he said that I had given campaign contributions, and he was extensively cross-examined on what he meant by campaign contributions, and on the tapes as well, he said it. Again, extensive cross-examination, and Ghilardi's words, in a sense, were very loose. There was one time he said, look, I gave him cash. I call it campaign contributions. You know, it's all the same thing to me. So there was, as the district court found, there's simply no way on that kind of evidence that this would have made a difference in the trial. Ghilardi was very loose about how he called these things. But even though there was some cumulative evidence on that, given the nature of this case, though, wouldn't the government concede that were the defense able to cross-examine him and be able to present this information that he had otherwise characterized these payments than what he had just done in a very inflammatory way in the trial, wouldn't that have arguably been very helpful to the defense? Look, if we had had this and we had seen it, we would have, in all caution, probably handed it over. But that doesn't mean that we think it's material because, in fact, he had those kinds of statements before. He had said campaign contributions. It was clear that Ghilardi used the word bribery and campaign contributions almost interchangeably. Well, they're not mutually inconsistent. You can bribe with a campaign contribution. Well, in fact, and that is the real point here. The question really is, as the jury instruction that I read you, the question really here is whether there was a quid pro quo for that money. That's the real issue here. And that's illegal whether or not it's a bribe under the table or whether it's a campaign contribution handed out at a fundraiser. So, really, how Ghilardi actually characterized it isn't the key issue. The key issue is what Guza thought, whether he actually made an exchange for it, another reason why it wasn't something that the district court found would be material. Now, the question of the $10,000. First of all, I would like to say Judge Miller was not incensed by this thing. In fact, he ended up finding he gave us the benefit of the doubt on it. But I would like to address the question of Ghilardi and the $10,000, obviously. This really boils down to a question of whether or not this should have been disclosed before trial. And there is nothing in the Constitution or in the discovery rules or any one of the district court's orders that requires the government to disclose a piece of testimony that one of its witnesses is going to give. Rule 16 puts up many discovery obligations on us, but it specifically exempts the notion that we have to give testimony before a witness testifies. We, of course, have to provide the gent material, which we did right before trial. And as the district court found, this wasn't Brady material because it wasn't exculpatory and it wasn't impeachment. And the whole point is here, it's also not Brady because it was disclosed. Brady is about nondisclosure. And here, when it was disclosed, the defense went to town on Ghilardi, and they still have not shown how they were in any way prejudiced. I'm sorry, you're still talking about the O'Melveny? No, no, no. I'm talking now about the $10,000. Oh, the $10,000. Testimony about the $10,000. The O'Melveny memo came out after a new trial motion was denied. The district court found that that was immaterial. But now on the question of the $10,000 that Nzunza has been complaining about, as does Duquette, here, again, they have not shown how it is that they were prejudiced by it not coming in earlier. That's really the claim here, that they should have had a pretrial right to that testimony. And when it came out, the defense aggressively attacked that testimony as untrue, uncorroborated, and outrageous. Duquette's counsel hammered home the fact that Ghilardi hadn't told us about it before, that he hadn't remembered it before, that the surveilling agents hadn't corroborated it, and he pointedly suggested that Ghilardi was lying to curry the government's favor. And Duquette took up the same line of argument with our surveillance agent. He brought him back onto the stand to point out that the pictures we took at the Grant Grill that day didn't show the passage of money, that the tapes didn't reflect the passage of money. So by the time he got to argument, he was arguing passionately that Ghilardi was a liar and that there was no corroboration for this, and that he even said, this fact has been disproved to a mathematical certainty that this fact didn't happen. And it's important here, also, that at no time did the defense ask for a continuance to try to respond to this argument further, which, as this court has said, that is the best way to clear up an inadequacy of notice problem. Really, given how things turned out in this case, it's hard to see how they would have done anything differently had they known about that testimony earlier. Their response was, Ghilardi's lying, this didn't happen, and quite frankly, they did a very good job of attacking it on that day. Well, they convinced the trial judge. Well, they convinced the trial judge that it was, they didn't convince the trial judge that it was perjury. The trial judge did not find that it was perjury, but they did. They convinced the trial judge that, and they, you know, they did a really good job, and that's probably why they put that piece of evidence front and center in their argument. It was Zutek who said, this is the heart of my case. If you don't believe that that $10,000 package, there is no case against me. This was not the centerpiece of the government's case by any means. And on that question about the representation of the government in the Bill of Particulars, if I just may say something quickly about that. The Bill of Particulars was in 2004. The government, in fact, the defense was asking for the identity of particular conversations that might be HOMS Act violations for that quid pro quo. When we said that there would be little chance of being surprised, we were talking about our discovery obligations, that we were living up to our discovery obligations. This was in 2004, and in that order, the district court very clearly said, look, it would be great if the defense could have all of the government's evidence, if we could open our files, but that's not, in fact, what's required. The defense isn't allowed, isn't given a preview of the government's case. So, the following year, when we had Ghilardi, and we were working with him, and he remembered this bit of money, we didn't think back on that one statement that we made and decide, hey, that requires us to make a disclosure that neither the rules, the Constitution, nor any court order has ever required of us to do. Kelsey, your time is running. I know. I need to get to Zucast. You may have to turn to Zucast. When it came time. Okay. Can you stop the clock? I just need a point of order here as to how we're going to proceed, because I didn't account earlier for rebuttal. The order does, but it just said that they saved time. It probably makes sense to let him do his response, which is brief, and let her start. Why don't we do that? Oh, you want to do that? Yeah. Let's hold her time. We'll give Mr. Coleman his remaining time, and I think that will keep all the lines straight. Thank you, Your Honor. A few points. Number one is, I just don't think the government gets it, and this Court over and over and over again, in Bowie and all these cases, is saying when it comes to cooperating witnesses, we want the government to bend over backwards to make sure that everything is turned over, that these issues are resolved before trial, because there is a very grave danger that when you have a cooperating witness who has every incentive to lie to help himself out, that the trial process is going to be distorted. And even today, the government gets up here, and with the O'Melveny memo, they say, well, yeah, we probably would have turned it over. Are you kidding me? This is a memo that says, I gave pure campaign contributions. It's not one of these things where he's saying campaign contributions, bribes. He's saying, I gave pure campaign contributions to the San Diego Councilman, and I wasn't doing anything wrong. And they're now going to say that maybe we would have turned that over? They don't get it. When a cooperating witness testifies, you better make sure that you turn over everything. And even after everything that went on in this case, they come up here and they say, well, maybe we would have turned it over. This court needs to, once again, Judge Trott and Boone, he said, you know, when a cooperating witness testifies, you need to make sure that there are none of these surprises, that the defense has everything that they're supposed to have. There is no question that that was grating material and that it should have been turned over. There are other things that the government has just said that I wanted to clarify. The government now, they're changing their position again. At the district court, and this goes to the facts as to who got what contributions, and I know it's confusing. Mr. Nzumza, in May and June of 2001, received two separate campaign contributions from Malone. He received about $1,000 and then about $8,000. This is called about $10,000 worth of campaign contributions. Down below, the government conceded that those were not pursuant to a quid pro quo, that they were not bribes. And I'll cite you to ER 834. The prosecutor says that the quid pro quo, quote, began with the payment on July of 2001, which is the Zuchat payment, and not with those prior payments that Malone had made to Nzumza. They conceded that. Have you got the record reference to that? Yes, ER 834. It's in bind four, I believe, of my excerpts of record. The government, in the indictment, did not charge the campaign contributions that Mr. Nzumza received in May and June as substantive honest services fraud violations or as Hobbs Act extortion violations. They conceded that those contributions were not pursuant to a quid pro quo. Now they want to come up here and tell the court, well, now they want to change their position again, which is the problem that we've had. They're always changing positions in this case. It was $10,000. It wasn't $10,000. It was a quid pro quo. And they continue to change it, even at this late stage on appeal. So I want the court to be clear of that. But other than the cash payments, the only quid pro quo that Mr. Nzumza supposedly engaged in were campaign contributions that were made to Mr. Zuchat. He didn't receive a dime of these supposed contributions that he, that were supposedly pursuant to a quid pro quo. And that's why Ghilardi's testimony about the underhanded cash payments was so absolutely critical. But you would agree, would you not, counsel, that if Mr. Nzumza received a campaign contribution for Mr. Zuchat, in exchange for a promise to introduce some legislation, that that would constitute an illegal activity? Yes, with one caveat. And this is an important caveat that the government, it was a mistake that Judge Mueller, I believe, made and the reason why good faith instruction should have been given. The quid pro quo is just not an exchange. It's not just a promise. There's another important element that was totally left out of this case. It is an exchange with the corrupt intent or the specific intent to violate the law. And the problem we have in this case was that there was no corrupt intent instruction given. There was no specific intent to violate the law instruction given. And the judge refused to give a good faith instruction. And the judge himself said, no, no, no, I think the quid pro quo is an objective standard, which is just wrong. And we cited this court's decision in Strand, and if you look at the Supreme Court's decision in Sundinan, those two cases established that it's not just simply an exchange. It is a promise with the corrupt intent that you want to be brought. It's not just simply people make campaign promises all the time. And just making a campaign promise and receiving a contribution is not a quid pro quo. It is that plus having the corrupt intent to intend to be bribed. That was not instructed to the jury in this case. Judge Mueller, we believe incorrectly, although we really tried hard in this case and there were a ton of issues, he just missed the fact that a good faith theory of defense instruction was essential to explain that. And I didn't get to explain that in my opening comments. So when the government gets up here and says all you need is an exchange, all you need is a promise, that's not true. That's not the definition of a quid pro quo. You need to have a specific and corrupt intent to violate the law and to be bribed. May I make one clarification to what he just said? Your time has expired. We're on to Zucchett. When it came time for the judge to instruct the jury on this case with Zucchett, with both the councilmen, Zucchett got exactly what he wanted. He got a strong quid pro quo instruction. The jury was instructed that we had to prove that there was a quid pro quo for those campaign contributions, that we had to prove that Zucchett explicitly agreed to accept a campaign contribution in exchange for a promise to perform an official act. We were also instructed that the quid pro quo had to be clear and unambiguous, leaving no uncertainty about the terms of the bargain. And they also were instructed that, about the realities of political life, that campaigns are oftentimes, have to be financed. And it is no violation of the statute, either Honest Services or Hobbs Act, to find that there is a, when a campaign contribution is given and when an official takes action before or after. It was very clear. And on to the Honest Services count, the jury was additionally instructed that the defense had to knowingly participate in a fraudulent scheme with the intent to deceive and cheat the citizens of San Diego. And on all those very pro-defense instructions, this jury convicted Zucchett. You know, like all stories, you oftentimes have to read to the end to actually see what was happening all along. But from your perspective, and including both cases, there was an explicit jury instruction regarding the specific intent that had to be there for there to be a quid pro quo. Absolutely. And there's no, I don't think there's any dispute about that. The judge worked very hard on this. Judge Miller said there has to be an explicit agreement to accept a campaign contribution in exchange for a promise to perform an official act. Plus, he even said, and you don't need, and it's not a quid pro quo just to act on behalf of a donor. And again, there's the intent to deceive and cheat instructions. But again, for Zucchett, we really have to go to the end of the story. Judge Miller put the book down in the middle. He looked at what happened at the beginning and the middle, and then he made his judgment there. But it really is the end that ties the Zucchett story together. By the end, Zucchett knew that the police strongly supported no touch. He also knew that the police position made some sense. Lieutenant Konofsky told him, look, not only is this a cleaner, more efficient way of enforcing our laws, this helps cut down prostitution. This is one that has a public safety bent on it, too. So, Zucchett knew that the police wanted no touch, and he knew how Malone wanted to get rid of it. And that was to have Malone, to have Zucchett get this issue out of his committee, the distance issue, so that Nzunda could later amend it at counsel. And Zucchett knew that that distance issue was baloney. He used a stronger word. He knew that it was entirely pretextual. He knew that Malone was going to bring in his hand-picked concerned citizens so that Zucchett could have an excuse for bringing up this issue, this distance issue. And he knew that the whole plan was about repealing no touch. And he did exactly what he said he would do. And the district court found that he engaged in deceitful conduct and participated in this charade. He welcomed the citizens. He said he was interested in that distance issue. And he made the referral, just like Malone wanted to. Just politics? The jury didn't think so. The jury saw that in all that deception, Zucchett wasn't acting for the police. He wasn't acting for the public. They saw that he was acting because he had made a deal with Malone in exchange for that money. But that evidence also doesn't even stand alone on Zucchett. On what evidence is his deal based? Where is the moment in time when he agreed that in exchange for the campaign contribution that he was going to perform corrupt acts? We believe that the deal, that the exchange came with the first exchange of money in 2001. But that occurred through Inzunza. He wasn't even there. No, he was there. It was at the Panda Inn. It was at a private meeting. We don't have a tape of the meeting. What happened was Inzunza had set it up for Zucchett, saying, here's this guy. He's with this industry. You've got to meet him. And he set up a private meeting with him for half an hour, and Zucchett met with Malone at that point, and he gave him the first batch of checks. We think it was at that point, because then at that point, Malone came afterwards, and he told Gilardi, we think that'll be the effect. You think he did that, but this is a criminal trial. You have to show it, prove it beyond reasonable doubt. So where's the evidence of that? There's more evidence of that. It's a course of conduct evidence. As this Court has said in Tucker, circumstantial evidence is just as good as direct evidence in the entire course of conduct. So we have the conduct at the end. We have the conduct at the beginning, too. The conduct at the beginning is Inzunza, as a district court found, very specifically agreed that Zucchett would help repeal No Touch in exchange for the money from Malone. Now, a jury could reasonably infer that Zucchett wasn't making that promise, and Inzunza wasn't making that promise, and he kept making the promise, and he kept soliciting more money from Malone, that on such a controversial issue, that Inzunza wasn't making that promise of Zucchett's help without Zucchett's go-ahead. A jury could infer that. One piece of evidence. Another piece of evidence. Malone consistently believed that Zucchett was on board, not just after his meetings with Inzunza, but after his meetings with Zucchett, too. The jury now, in this case, did hear more from Malone, because we didn't catch the counselman's phone, and we didn't catch all the conversations between Malone and Zucchett. Counselor, I need to ask a question here. The breakfast meeting, is that the April 2003? Yes, the breakfast meeting was April 2003. April 2003. And you're saying at that point that Zucchett knows what the deal is? Zucchett knows what's happening, what the plan is with the counsel? Yes, at that point, the very specific plan about the concerned citizen. And the concerned citizen, that occurs when, what month? Also at the end of April. At April of 2003. Correct. Okay. Now, what money does Zucchett accept after April of 2003? None. Okay. And what was the last payment that Zucchett would have received before April of 2003? He accepted money in February 2002 and October of 2002, and I want to clarify. So that would have been more than a year before. So 14 months previously and six months previously, you're saying he took money, but you told us that he knew exactly what was happening, but he doesn't know what's happening until April of 2003. How do you link the money he received during the campaign in October of 2002, which is the month before the election, or money he received 14 months earlier, with the conspiracy that he doesn't even know what's going on until April of 2003? He knows well what's going on. At 2003 is when they're very specific. Okay, we're going to do this thing before the public service committee. We don't think that the agreement has to be that specific, that you have to know. In fact, this case in Tucker said, you take a campaign contribution and you offer to help. But all the things, all the points that you just made, all the things about what Zucchett knew, all of those are things that he probably would not, that he could not have known in October of 2002 or February of 2002. The point about the end is about the deception. It's about the deception which helps prove the original quid pro quo. Having the person come and testify that was the alleged concerned citizen? That helps prove that he is willing to go that route. We believe that he made his agreement to help repeal No Touch in 2001 in exchange for those campaign contributions. He may not have known exactly what Malone wanted him to do. He doesn't need to know that. It can't be that you catch the campaign contribution, you say, I'll be on a retainer for you or I will help you do whatever you need to do. He doesn't have to know exactly what's needed because at that point the plan was not set. Malone didn't know. He just wanted to get Zucchett on board at that point. And remember, and Zucchett, and this was important to the district court. The district court believed importantly that what Malone's view of Zucchett's commitment was important. But the district court got that wrong. The district court, for whatever reason, at the Rule 29 it was late. It was a few months after the trial. It was a very big trial. The district court didn't see that he read the tapes wrong. But it's on the tapes. The tapes, every time that Malone is, the district court thinks that Malone is hedging about Zucchett's commitment. In fact, Malone is saying things like, Zucchett is big time on board. We've got our boys up in San Diego, our guys, our players. And also it's important, again, the course of conduct. We've got to look at this from beginning to end, the overall course of conduct. There's the deception. The fact that Zucchett made sure that the money was hidden. The fact that the money wasn't going to be, he couldn't trace it to Ghilardi. And then we look at the meeting. Counsel, the story you're telling there could affect almost every member of Congress. I mean, that's the reality. Somebody that doesn't know what the deal is, you go back afterwards and there's circumstantial evidence saying, well, he had to know this and he had to know that. And he returned some campaign contributions because they were not proper. Every senator and every congressman returns campaign contributions because they're not proper. They come in from a corporation. They come in from a union or something like that. It happens all the time. But what happened in our case is he returned the contributions because his staff had Googled them. He saw that they were connected to Ghilardi Enterprises and he said, I can't take these now, but I can take them from you later, maybe after the campaign is over. And then, again, he then took, in the next installment of campaign contributions, he took contributions as long as they weren't tied to Ghilardi. He joked about it. He said, I'll only take money from the trainer after it was all over. He was hiding the source of the campaign contributions. And then, again, in February of 2003, that meeting where they sat down, the beginning of the session, to try to figure out a way to repeal No Touch, to hide it in a package of cover issues. Now, the jury could reasonably infer that this wasn't an exploratory meeting. It was a strategy session by those people who were already on board. They're trying to figure out how to get the job done. And Zucchett himself was right in there saying, coming up with some other creative thing to try to get this repealed. And he even was the one who came up with a timeline, who said, maybe we can get this done in six months if we're lucky. Again, all that hiding, the deception, the concealing, a jury could reasonably infer that if people were doing that, if they thought what they were doing was okay, they wouldn't be hiding and deceiving. The jury could infer that the hiding, the deception, was all about covering up something that was wrong. And the thing that was wrong was the illegal pro quo. And there was even more to this scheme, of Malone's scheme. In the back end, Malone was going to have his police officer, his cop, testify in front of the council that this was all a waste of time, that we didn't like No Touch. Zucchett knew that. When did Zucchett go to Lieutenant Kanasky? In March 2003. One month before the April meetings when all this scheme was in place, he goes to Kanasky, which is the wrong guy from Malone's perspective. Correct. He's the wrong guy. He goes to Kanasky, but he learns from Kanasky, Malone makes a frantic effort. Here's the point I'm having trouble putting together. He goes to the wrong cop. He doesn't go to the corrupt cop. He goes to the right guy in the chain of command. Here's answers that are contrary to what Gilardi is going to want him to hear. You're telling us that then by the following month that it's very clear that Zucchett is on board, they've got this whole scheme with this dummy citizen that's going to come in, they've got the whole thing set up like a great big Rube Goldberg, but it looks like everything is going to drop into place. The concerned citizen comes in and the council then refers it over to the planning group, and at some point they're going to repeal No Touch in exchange for a half a dozen other things that appear to be illusory, including the distance issue. I'm having a hard time connecting that to campaign contributions that were given him either 16 months earlier in October of 2002 or 14 months earlier in February of 2002. Whatever I might think about what Zucchett knew or didn't know and what his motivation might be in April of 2003, I'm having a very difficult time finding the link between that and campaign contributions he got a long time earlier. Because our view is because he made the promise a long time earlier, and remember LG4 is an office. He had to get an office. The meeting in February 2003. But the only way that you can prove the promise is by showing that he did the act in April of 2003. Because you have no other evidence. No, I do have my other evidence, and excuse me, I'm running out of time. So you're way over your time. I'm way over time. I think it is the INZUNZA promise. I think it's the Malone on board. I think it's hiding the money. I think it's the Zucchett big time on board. It's the hiding the money. It's the February strategy session where they're trying to hide the money. And it's the INZ, the whole course of conduct. And yet the trial judge found that Zucchett during that time seemed to be confused about what the story was, what the deal was, and so on, that there was really no basis to find him guilty on particular charges based upon his understanding of the scheme, which goes to the point that Judge Bivey made. How do you tie all this together? We do think the trial judge made a mistake, but as we've argued, because he didn't look at the entire course of conduct, we've got to look at the end to see what happened at the beginning. But if I may make one quick last comment about what the trial judge did. Even looking at the evidence as the trial judge saw it, that Zucchett's agreement came in 2003, that it didn't come any earlier, he still abused his discretion in granting the new trial. Because at that point in 2003, what the district court did was it found Zucchett's agreement, and it was very clear. I'll do the listing at committee. You've got a deal. I'll get that on. What the district court did was look around for some money to match up with that. But that's not how a conspiracy works. Zucchett did not need to himself take money in 2003 to join the Inzunza and Malone conspiracy. That was a mistake, a legal mistake on the district court's part. And evidence by 2003 shows that Zucchett clearly knew what was up between Inzunza and Malone. He knew about the money. He knew that Inzunza was making sure that the tie to Ghilardi was hidden for the money. He knew that Inzunza had no other interest in this issue, and he knew that Inzunza was going out of his way, way out of his way, to help repeal No Touch for Malone. Here is Inzunza. He doesn't have any of these clubs in his district. He is suggesting at this February 2003 meeting, he's really leading the charge here, here's this avowed liberal who's saying we can wipe out all the nude clubs in San Diego in order to try to repeal No Touch. Zucchett could see what was happening there. And also after he meets with Kanaski, comes back and tells Inzunza, hey, you know, the police really like this issue. The police really care about No Touch. Still, Inzunza is full speed ahead trying to repeal No Touch. He tasks his staff. He agrees with this whole sham citizen campaign. Zucchett is not, can still be guilty of the conspiracy, regardless of whether he took any money at that point, even if you accept the district court's view of the fact that it happened in 2003. And he's got to know that Inzunza in return for campaign contributions to Zucchett. To either him or to Zucchett. He knew that there were campaign contributions to both Inzunza and Zucchett. And, in fact, the campaign contributions to Inzunza were charged as part of the Honest Services Conspiracy. We didn't charge them as a separate Hobbs Act claim. They were charged as part of the Honest Services Conspiracy. And the district court found that they were part of the Honest Services quid pro quo. But Zucchett needed to know that Inzunza and Malone had a deal to help repeal No Touch in exchange for those campaign contributions. And by taking that deceptive action in front of the district, in front of the PS&S committee, he showed that he participated.  Thank you, counsel. Good morning, Your Honors. Dennis Reardon for appellant at the league, Zucchett. I really don't have a dog in the McNally fight, but it's so interesting. Let me just make two comments. One is the court is well aware that the only legislative history is a comment that 1346 was intended to revive the case law prior to McNally. Who made that? Who made that statement? Well, we were citing, I think, Congressman Conyers. I remember there's one or two statements to that effect. But my point is just this, Your Honor, that 1346 has been used since then in all sorts of situations that don't in any way correspond to pre-McNally law. And secondly, here's how wild this has gotten. On Monday, before another panel of this court, the government will take the position that in reviving, in passing 1346, the United States Congress made it a crime for any official anywhere in the world to deprive the citizens of their country of their honest services, in that case, Ukraine. So if the court is thinking that we desperately need some boundaries and clarity to 1346, the court is certainly right. Turning to this specific case, and I will say this, the government misspoke when they said the indictment in this case, it's okay, the honest services part, because it explicitly made a quid pro quo. It alleged a quid pro quo as the basis for the honest services scheme in this case. That's absolutely false. There is no, in the honest services part, allegation of a quid pro quo. That's in the Hobbs Act part. And, in fact, the government down below was arguing with Judge Miller that there shouldn't be any honest quid pro quo component to 1346. They ought to be able to go on some amorphous violation of fiduciary duty. I'd like your response to this. I'm quoting what Conyers said here. This amendment restores the mail fraud provision to where that provision was before the McNally decision. The amendment also applies to the wire fraud provision and precludes the McNally result with regard to that provision. The amendment adds a new section, 618 U.S.C. 63, that defines the term scheme or artifice to defraud to include a scheme or artifice to defraud another of the intangible right of honest services. Thus, it is no longer necessary to determine whether or not the scheme or artifice to defraud involved money or property. This amendment is intended merely to overturn the McNally decision. No other change in the law is intended. That's what he said on the floor. Is that what he said? That's all he said on the floor. So we've got the Prime Minister of Ukraine being charged with honest services fraud for depriving the citizens of Ukraine of his honest services in the Lazarenko case. It is out of control, and it needs sense to it. But let me turn to my client. The government said one thing I absolutely agree with. Judge Miller acquitted on seven counts, the last of which is March 3, 2003. The government agreed it had to prove beyond a reasonable doubt that before that date, March 3, 2003, Councilman Zuchett made an explicit, unambiguous promise to trade legislative action or official action for campaign contributions that he received in 2001 and 2002. Not only is it absolute rubbish to say that there is a shred of evidence in this record that before that date, Michael Zuchett said anything, winked, nodded in any way that he was going to do something specific. It is just the government's complete absence of evidence. The government attempts to remedy with this incredibly dangerous argument that lacking. What did they say when the court said where's the evidence before March 3, 2003? They said, oh, well, in April, he did something. You know, he sponsored a piece of legislation. So what they are saying is exactly what the Supreme Court said they may not say. You may not, you may not, you may not on the circumstantial evidence that there was a campaign contribution at some point, and even soon before or after official action was taken, you may not premise a bribery or a Hobbs Act, or in this case, an honest services violation conviction on the fact of the coincidence of legislative action and campaign contribution. And they are saying, oh, no, a jury can infer that if he decided in April to do something that favored no touch, then they can infer that a year and a half earlier when he received campaign contributions, he was saying that I will do something a year and a half later. It is nonsense, and they know it's nonsense. I refer you to pages 175 to 182 of our ER, a conversation with Lance Malone and Officer Bristol on 3-18-2003, 3-18-2003, two weeks after the last acquittal, the last charge on which Judge Miller acquitted. And what Malone is saying is, I don't know Zuket that well. I just can't understand why he won't listen to me. He's going to call Konofsky. I don't want him to call Konofsky. Bristol is saying he'll screw up the whole plan if he calls Konofsky. There's another tape at this time of Ghilardi saying in his usual French accent, he'll screw up, to put it politely, our whole plan. There is, it is positive proof. I mean, we have tapes of the conversations between Malone and Zuket, and they are, I don't know what you're talking about, getting me up to speed on this. Well, my concern is I'd like to get lay girls out of my area. Maybe, you know, maybe we can log roll on this. And it's all the sort of things that go on in normal politics. Where, if they've got the tapes of Malone and Zuket, where is the, hey, Mike? If I understood opposing counsel's argument, it was that I understand your point, certainly, that, you know, working hard to get particular legislation shouldn't be evidence of some prior agreement by itself. But they're saying that it was such a peculiar legislative operation that there must have been something wrong, some promise made earlier, that the subterfuge and, you know, the faith. Do you have a comment on that? Absolutely. And, you know, Michael Zuket can regret for the rest of his life that he was doing Malone a favor. And in April, Malone is saying, I've got to produce something for my boss. And he says, look, it won't do any good, but if you want me to refer this over there, and, you know, I know that it's to try and get a repeal, but we'll make the law more stringent and so forth. It's in April. Okay? So let's deal with it as Judge Miller did. Let's deal with April as April. But when in March you have affirmative evidence, affirmative solid proof that Malone knows that Zuket isn't doing what he wants to do, he hasn't agreed to do anything, you can't infer backwards. You can't infer backwards when the record is clear. I mean, what they're saying is, you look at Zuket's statements. They've got him on tape. And he's saying, I don't know what you're talking about, or let's discuss it, or here's the policy considerations, or I won't do anything that the police don't approve of. I have to see Konofsky. That's what he's saying. And they're saying, well, that's his mental state. But you've got Malone going with his boss saying, oh, I think I can get this done. I think I can get this done. Well, you know, you could take Jack Abramson, who's going to his clients and getting millions and millions of dollars for lobbying, saying, oh, I've got Senator so-and-so or Congressman so-and-so in my pocket. That is proof beyond a reasonable doubt that that Congressman or Senator is corrupt. Nonsense. Not when you've got the tapes themselves. Look at what they're talking about, proof beyond a reasonable doubt. Oh, there was a, you know, he met him in 2001 at a fundraiser. We don't know what was said. We have no evidence that anything corrupt was said. But a jury can infer there was corruption there on the absence of evidence. This case is about one thing. It's about the fact that you've got a disfavored, to say the least, legislative project here. They've got Ghilardi. They've got his no touch and so forth. And what they are saying, and they just said it, is, you know, there's something unsavory about it. Well, there are many jury members in San Diego, I'm sure, who find no touch unsavory. Well, there's a lot of people in the world that find offshore drilling unsavory. There are a lot of people in the world who find real estate development unsavory. You can always find people who would be inclined to convict somebody because they don't like the legislative project that we're talking about. But what the Supreme Court has said is that's American politics. Find an explicit promise, an explicit promise to be controlled, to be controlled. So take the conversations between Malone and Zuckett between 2001 and March 3rd, 2003, the last date of conviction on which Judge Miller set aside. Find one word of control. Why isn't Lance Malone saying, hey, Mike, you know, you know what you said to us. You know there's an agreement between us. Money for help. And he's going, please, the police will back it. It really, it's a good thing. There are good policy considerations here. And Zunza is saying in the beginning not Mike Zuckett can be bought. He's saying Mike's good on this issue. If counts one to seven can stand on this record, there is not a politician in this country that can't be convicted. There is not a politician who hasn't dealt with lobbyists, who hasn't talked with lobbyists, who hasn't discussed issues with lobbyists, and who then later takes action. One thing that the government wants to avoid is that if on March 3rd, 2003, Zuckett is not guilty of being, agreeing to be controlled by legislation, he is not guilty of those seven counts. He cannot be retroactively guilty. It is a quid pro quo. It is not, someone could, a legislator, unlike the government's position. What about the conspiracy theory? The theory that all he has to really know at some point before the end is that there was an agreement between Zunza and the government. Okay, that there is, well, that there is. I mean, Zunza and Golarity. Well, he would have to know that there was an agreement by Zunza to sell Zuckett's legislative action in return for campaign contributions. He would sell Zunza's legislative action or Zuckett's official action for campaign contributions to Zuckett. Again, go to March 3rd. There is not an irony. Why isn't Lance Malone saying, you know what Ralph and I are up to? In fact, in fact, if you look at the conversation I just mentioned, he says, you know, I know in Zunza, this is Malone, but I don't really know Zuckett. And he's saying. I thought there was a little different problem here with the conspiracy charge. That is, it seems to me that someone could join a conspiracy even if he hadn't agreed previously to accept campaign contributions. It might be in the thought that he's going to get future campaign contributions. Or it could be something as diffuse as thinking, you know, if Zunza may be on the take, I'm not interested in money, but there are other things that I'm interested in getting out of this position, and Ralph's going to cooperate with me. Yes, but the problem is the same. Between up to, if we're talking about the seven counts that Judge Miller acquitted on, there is not, what you would need is proof beyond a reasonable doubt of an agreement to join a conspiracy to trade official action for money. There's not a word of it. What about the ones on which you ordered the new trial? Okay, so let's go to the new trial counts, and look, we're dealing with a district court judge who knows his standards of review. I remember when he went through the seven and said, no, you can't support any of them. I affirm, I will not acquit on the last two. Now let me turn to my powers as a district court judge. And what it comes down to there is Judge Miller said, I'm the guy who saw these witnesses. I saw Velardi testify, and I am telling you that I, in essence, I deeply, deeply am disturbed by these verdicts. We may have an innocent man who has been convicted of a felony, and this court has said, when you get to that, it noted in Alston that until 1984, it was a non-appealable order to grant a new trial. And it's in this court. The new trial, just a point of clarification, the new trial will cover what? The April 2003, joining the conspiracy in April? It would cover, count one on the theory that he joined the conspiracy in April 2003, and the final count, which I believe is 32, which is the one male fraud count which occurs in April, a wire fraud count. And what this court has said, although it's now appealable, a court of appeals will only rarely reverse a district court's grant of a defendant's motion for a new trial, and then only in egregious cases, and the reason for that is the judge saw the witnesses. And what Judge Miller said is, okay, I will not judge the Ghilardi's testimony about the $10,000. I can't judge its credibility under Rule 29, so I won't acquit on that. However, I have the power. I saw this man. I saw that $10,000 testimony, and I am telling you that we need a new trial on those two remaining counts, as well as the other seven, if this court were ever to reverse on the acquittals. And this court basically has said, when a trial judge has seen those witnesses and the trial judge says he is so disturbed by the testimony that he thinks a miscarriage of justice has occurred, we, the court of appeal, will not go in there and do as the government says. What was the case you're quoting for that? Alston. United States v. Alston, 974, Fed 2nd, 1206, which also cites the United States v. Kellington. We owe 217, Fed 3rd, 1084. We owe special deference to the district court's evaluation of the testimony at trial. Judge Miller said, this man, in my opinion, is not credible. On the other hand, the single most inflammatory piece of testimony in this case is the allegation that Gilardi's bag man somehow conveyed $10,000 to Zuckett. You know, that wasn't even alleged in the indictment. If the conspiracy is based on the $10,000, then it's a conspiracy that wasn't charged in the indictment. If it's not based on the $10,000, then there's no quid pro quo. You can't retroactively enact the quid pro quo. You can't take a contribution from an industry and say nothing in their favor, and then two years later look at a piece of legislation and say, you know, my constituents want that. My biggest campaign contributors want that. That is a factor in my decision. That's not a quid pro quo. That's not a quid pro quo. A quid pro quo is when you get the money, you agree to be controlled by it, and there's just not a shred of evidence in there on that. The standard on the new trial motion is absolutely deferential, but Judge Miller was just spot on when he looked at the evidence and said, look, not everybody understands the First Amendment. Not every juror is going to understand that there is a subtle but crucial difference between being affected by the views of your campaign contributors and doing what they'd like you to do and being controlled by them. But I understand the difference. I've gone through this record. There ain't nothing in it up until March 3rd that supports the first seven convictions. Thank you. Thank you. Counsel, you used your time. I will allow you one minute, but it will be one minute. Thank you, sir. First, on the question of the conspiracy count, counsel is right. Deference is owed on a new trial motion to the judge's assessment of credibility. Our argument is that that $10,000 is legally irrelevant. There is no deference that is owed to the trial judge if he's making a legally, if he's basing his judgment on a legally impermissible theory, and our theory is that he can join the conspiracy regardless of whether he took that money. That is irrelevant to a conspiracy conviction. And also, very quickly, on all the other counts, in all due respect, the inferences that the counsel is arguing for here, these were all argued to the district court. They're all argued to the jury. They're all, he argued, this was just politics as usual. They brought in an expert to say this was just politics as usual. This jury, well instructed, found otherwise. It found that beginning in 2001 and through the rest, the course of conduct, starting in 2001, then going into 2003, and then going into the end, the whole course of conduct, the deception showed that they knew that there was an illegal quid pro quo. Thank you. Thank you very much. We thank all counsel for your argument. The court stands in recess. Your Honor, on the back of the bar, does the court agree that there is a report of the legislative history of the presentation? The legislative history and anything said in the legislative history relating to the meaning of the deprivation of honest services. Thank you.
judges: Canby, Bybee, Smith